

OG, USAO2015R00212

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2016 AUG 24  PM 3: 48

CLERK'S OFFICE
AT BALTIMORE

BY ___ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * **UNDER SEAL** |
| v. | * |
| | * **CRIMINAL NO.** RDB-16-0428 |
| MOHAMMAD IRFAN, and | * |
| MUHAMMAD SARMAD, | * **(Conspiracy to Commit Food Stamp** |
| | * **and Wire Fraud, 18 U.S.C. § 371; Food** |
| | * **Stamp Fraud, 7 U.S.C. § 2024(b); Wire** |
| **Defendants** | * **Fraud, 18 U.S.C. § 1343; Aiding and** |
| | * **Abetting, 18 U.S.C. § 2; Forfeiture, 18** |
| | * **U.S.C. §§ 981(a)(1)(C), 21 U.S.C. § 853,** |
| | * **and 28 U.S.C. § 2461(c))** |
| | * |

*******

**INDICTMENT**

**COUNT ONE**
**(Conspiracy to Commit Food Stamp and Wire Fraud)**

The Grand Jury for the District of Maryland charges that:

**Introduction**

At all times relevant to this Indictment:

**Persons and Entities**

1.      Defendant **MOHAMMAD IRFAN ("IRFAN")** was a resident of Maryland and a

citizen of Pakistan.

2.      Family Member A was the ex-spouse of **IRFAN** and a resident of Maryland.

3.      Defendant **MUHAMMAD SARMAD ("SARMAD")** was a resident of

Baltimore, Maryland.

4.      Family Member B was a niece of **IRFAN,** a resident of Maryland and married to

**SARMAD**.

1

5.      Family member C was an adult child of **IRFAN** and Family Member A, and was a resident of Maryland.

6.      Family Member D was an adult child of **IRFAN** and Family Member A, and was a resident of Maryland.

7.      Quick Food Stop, Inc., d/b/a the New Sherwood Market, ("New Sherwood") was a convenience store located at 6324 Sherwood Road in Northwood, Maryland.

8.      Martin Mart, d/b/a Stop 1, ("Martin Mart") was a convenience store located at 1504 Martin Boulevard in Middle River, Maryland.

9.      Rosedale Mart, Inc., d/b/a Stop One Market, ("Rosedale Mart") was a convenience store located at 6326 Kenwood Avenue in Rosedale, Maryland.

10.     M&A Mart, Inc., doing business for a time as A&M Convenience and then doing business as Taylor Mart, (hereinafter collectively referred to as "M&A Mart"), was a convenience store located at 7400 A Belair Road in Baltimore, Maryland.

### The Food Stamp Program / Supplemental Nutrition Assistance Program

11.     Congress passed the Food Stamp Act of 1977, which was later renamed the Supplemental Nutrition Assistance Program ("SNAP"), in an effort to alleviate hunger and malnutrition. The program used federal tax dollars to subsidize low-income households, which permitted those households to obtain a more nutritious diet by increasing the food purchasing power of eligible persons. SNAP was jointly administered by the United States Department of Agriculture ("USDA") and the Food and Nutrition Service ("FNS") together with various state agencies.

12.     Title 7 of the Code of Federal Regulations, Section 278.2(a), prohibited an authorized retail food store from accepting food stamp coupons in exchange for cash. Further, Title 7 of the Code of Federal Regulations, Sections 278.2(a) and (h) provided that food stamp

coupons may "only be accepted from eligible households or the households' authorized representative, and only in exchange for eligible food." Title 7 of the Code of Federal Regulations, Section 271.2 provided that food stamp coupons included "an electronic benefit transfer card or personal identification number issued pursuant to the provisions of the Food Stamp Act of 1977, as amended, for the purchase of eligible food."

13.     In Maryland, SNAP was administered by the Maryland Department of Human Resources ("DHR") and was known as the Food Supplement Program ("FSP"). Maryland implemented FSP, funded by SNAP, through an Electronic Benefits Transfer ("EBT") system. FSP customers were issued plastic EBT Cards which contained an embedded magnetic stripe that stored basic information required for food purchases. Retailers approved by FNS to accept SNAP were assigned an FNS authorization number and, in some cases, were provided with a point of sale ("POS") device to access the electronic funds allocated to customer's EBT Cards. POS devices communicated with the Maryland EBT central database to debit a customer's available SNAP benefit balance for the cash value of eligible food items purchased.

14.     Under the FSP, benefits were automatically added to a recipient's EBT Card on a monthly basis. When an EBT Card was swiped through a retailer's POS terminal, the swipe caused an electronic transmission of information through a series of network switches to the central Maryland EBT database located in Texas, which contained customer account balance information. The EBT contractor verified the retailer was authorized to conduct SNAP EBT transactions. The Maryland EBT system verified the amount of benefits available, authorized the transaction, and deducted the purchase amount from the customer's available balance. The system also calculated cumulative FSP sales for each retailer and authorized electronic payments to the retailer's bank account.

15.     Once the EBT was approved, information flowed back to the POS terminal and the store employee received confirmation that the cardholder's account had been successfully debited.  FSP EBT transactions were made for the exact amount of the sale and no change was given to the cardholder.  SNAP reimbursements were paid to authorized retailers through a series of electronic funds transfers.  On a daily basis, the EBT contractor, located in Austin, Texas, reconciled accounts for participating SNAP retailers in Maryland.

16.     In order to participate in the SNAP as an authorized retailer, a business submitted FNS Form 252, Food Stamp Program Application for Stores to FNS.  As part of that application, the store owner/manager certified that they understood and agreed that "trade[ing] cash for Supplemental Nutrition Assistance Program benefits" was a "violation" of SNAP regulations.

17.     In order to receive SNAP reimbursements, authorized retailers were required to establish a single authorized bank account, approved by FNS, into which EBT benefits from legitimate food stamp transactions would be deposited.

## Participation in the Food Stamp Program

18.     On or about February 1, 2005, **IRFAN** incorporated New Sherwood was an owner of New Sherwood and the resident agent for the company.  **IRFAN** was an owner and resident agent of the business.

19.     On or about February 21, 2005, **IRFAN** signed and submitted an FNS Form 252 for New Sherwood. As part of that application, **IRFAN** certified that he understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

20.     On or about March 7, 2005, New Sherwood was licensed by FNS to participate in the food stamp program as a SNAP retailer.

4

21.     In or about January 2009, Family Member A incorporated Kenwood, Inc. ("Kenwood"), which was a convenience store located at 6326 Kenwood Avenue in Baltimore, Maryland.  Family Member A also signed and submitted an FNS Form 252 for Kenwood in which she certified that she understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

22.     In or about February, 2011, Kenwood was licensed by FNS to participate in the food stamp program as a SNAP retailer.

23.     In or about June, 2011, FNS permanently disqualified Kenwood, Inc. from participating in the food stamp program due to food stamp trafficking at Kenwood.

24.     On or about May 6, 2011, **SARMAD** incorporated FAJR, Inc., d/b/a Stop One, ("FAJR") with a business address of 6326 Kenwood Avenue, Baltimore, Maryland. **SARMAD** was the resident agent and owner of the business.

25.     In or about May, 2011, **SARMAD** submitted an FNS Form 252 for FAJR to FNS in which he certified that he understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

26.     On or about June 29, 2011, FAJR was licensed by FNS to participate in the food stamp program as a SNAP retailer at 6236 Kenwood Avenue, Baltimore, Maryland.

27.     On or about February 22, 2012, **SARMAD** withdrew FAJR from the SNAP program.

28.     In or about February 2012, Family Member B incorporated IQRA, Inc. ("IQRA") with a business address of 6326 Kenwood Avenue, Baltimore, Maryland, and was the resident agent for the business.

29.     On or about March 1, 2012, Family Member B signed and submitted an FNS Form 252 for IQRA, doing business as Stop One, to be a SNAP retailer with a convenience store

5

located at 6326 Kenwood Avenue, Baltimore, Maryland.  Family Member B certified in that application that she understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

30.     On or about April 26, 2012, M&A Mart was incorporated with Family Member A as the resident agent and director of the company. The business address for M&A Mart was 7400-A Belair Road, Baltimore, Maryland.  M&A Mart was not licensed to participate in the food stamp program as a SNAP retailer.

31.   On or about June 20, 2012, IQRA was licensed by FNS to participate in the food stamp program as a SNAP retailer.

32.     On or about November 16, 2012, FNS permanently disqualified IQRA, Inc. from the SNAP program for food stamp trafficking at IQRA.

33.     On or about July 3, 2013, Rosedale Mart was incorporated with Family Member D listed as the owner, resident agent and sole director.

34.     On or about July 15, 2013, an FNS Form 252 was submitted to FNS for Rosedale Mart  in which Family Member D certified that she understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

35.     On or about October 18, 2013, Rosedale Mart was licensed by FNS to participate in the food stamp program as a SNAP retailer.

36.     On or about January 14, 2014, Martin Mart Inc. was incorporated with Family Member C listed as the owner, resident agent and sole director.

37.     On or about May 9, 2014,  an FNS Form 252 was submitted to FNS for Martin Mart in which Family Member C certified that he understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

38.     On or about May 22, 2014, Martin Mart was licensed by FNS to participate in the food stamp program as a SNAP retailer.

39.     In or about January, 2016, Rosedale Mart was withdrawn from the food stamp program and ceased business operations at 6326 Kenwood Avenue.

### The Scheme to Defraud

40.     From in or about October, 2010 through on or about at least August 5, 2016, in the District of Maryland and elsewhere, the defendants,

**MOHAMMAD IRFAN, and
MUHAMMAD SARMAD,**

and others known and unknown to the Grand Jury, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions from SNAP, a federally funded national malnutrition program jointly administered by USDA and FNS, together with various state agencies ("the scheme to defraud").

### The Conspiracy to Defraud

41.     From in or about October 2010 through on or about at least August 5, 2016, in the District of Maryland and elsewhere, the defendants,

**MOHAMMAD IRFAN
and
MUHAMMAD SARMAD,**

did knowingly and willfully conspire and agree with each other, and with  others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.     to knowingly use, acquire, and possess food stamp coupons, through an EBT Card, having a value in excess of $100 in a manner contrary to the Food Stamp Act (Title 7, United States Code Section 2011, et seq.) and the regulations issued pursuant to that program in that the defendants, directly and indirectly, purchased food stamp benefits for cash; and

b.      to knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signals, pictures and sounds in violation of Title 18, United States Code, Section 1343.

## The Object of the Conspiracy and Scheme to Defraud

42.      It was the object of the conspiracy and scheme to defraud that **IRFAN, SARMAD** and others would debit and cause to be debited funds from EBT cards and pay the individuals who had presented the EBT card in cash at less than full value and typically in an amount that was half the value of the amount debited from the EBT card.  To avoid detection, the defendants and others would often cause a manual transaction to be entered into the POS terminal at New Sherwood when the individual presenting the EBT card for cash was at the Rosedale, M&A Mart or Martin Mart store.  Also in order to avoid detection, the defendants and others would sometimes debit or cause to be debited funds off of an EBT card in multiple transactions over a period of hours or days.  By executing the scheme to defraud, **IRFAN** and **SARMAD**, by and through family members and others, obtained more than $3,550,662 in EBT deposits for food sales that never actually occurred or were substantially inflated.

**Manner and Means of the Conspiracy and Scheme to Defraud**

43.     It was part of the conspiracy and scheme to defraud that **IRFAN** and **SARMAD** and others created and caused family members to create Maryland corporations for the purpose of operating various convenience stores that participated in the food stamp program in Baltimore, Maryland.

44.     It was further part of the conspiracy and scheme to defraud that **IRFAN,** **SARMAD** and various family members applied to, and obtained authorization from, FNS to participate in the SNAP program in the names of the various Maryland corporations.

45.     It was further part of the conspiracy and scheme to defraud that **IRFAN** and various family members opened bank accounts for the purpose of receiving SNAP benefits.

46.     It was further part of the conspiracy and scheme to defraud that **IRFAN** had sole or shared signature authority for each of those bank accounts and he controlled most or all of the activity in most of those accounts.

47.     It was further part of the conspiracy and scheme to defraud that **IRFAN,** **SARMAD** and others caused EBT point of sale devices in Maryland to electronically transmit interstate requests to authorize transactions and deduct amounts from EBT customers' available balances for unauthorized and unlawful purposes.

48.     It was further part of the conspiracy and scheme that **IRFAN**, **SARMAD** and others caused the Maryland EBT System (through the EBT contractor) to electronically transmit an interstate signal that authorized electronic payment to the bank account of one of the convenience stores.  Once the transaction was approved, information flowed back to the POS terminal confirming that the cardholder's account had been successfully debited.

49.     It was further part of the conspiracy and scheme to defraud that the defendants and their co-conspirators would and did obtain cash in exchange for redeeming SNAP benefits for cash.

50.     It was further part of the conspiracy and scheme to defraud that the defendants and their co-conspirators would engage in and cause the convenience store employees to engage in false and fraudulent transactions in which they would debit EBT cards for store customers in exchange for cash at less than the full value entered into the EBT system.

51.     It was further part of the conspiracy and scheme to defraud that in order to avoid detection, **IRFAN, SARMAD** and others debited and caused to be debited funds off of some EBT cards in multiple transactions over a period of hours or days in order to disguise the fraudulent nature of the transactions.

52.     It was further part of the conspiracy and scheme to defraud that in order to avoid detection, **IRFAN, SARMAD** and others conducted and caused to be conducted some of the fraudulent EBT transactions by causing manual transactions to occur in New Sherwood or Martin Mart for EBT cards presented by customers located in Martin Mart, Rosedale Mart or M&A Mart.

53.     It was further part of the conspiracy and scheme to defraud that I**RFAN, SARMAD** and others falsely and fraudulently redeemed and caused to be redeemed from the United States government the full amount of the EBT food stamp benefits charged on the EBT cards and caused this money to be deposited into bank accounts controlled by **IRFAN**.

54.     It was further part of the conspiracy and scheme to defraud that **IRFAN** would regularly withdraw large sums of cash from the bank accounts into which the United States had deposited the fraudulently obtained EBT food stamp redemptions.

55.     As a result of these unlawful cash transactions, **IRFAN** and others received more than $3,550,662 in EBT deposits for food sales that never actually occurred or that were greatly inflated. **IRFAN** and **SARMAD** knew that exchanging cash for EBT benefits was in violation of the laws, rules and regulations regarding the food stamp program.

## Overt Acts

56.     In furtherance of the conspiracy and scheme to defraud and to affect the objects thereof, at least one of the co-conspirators committed and caused to be committed, in the District of Maryland and elsewhere, at least one of the following overt acts:

a.      On or about April 13, 2015, **SARMAD** exchanged $60 in cash for EBT food stamp benefits on EBT card number ending in 4687 at Rosedale Mart by calling New Sherwood, relaying the EBT card number and Personal Identification Number ("PIN") to the person to the telephone, and causing a manual transaction in the amount of $120.25 for that EBT card on the New Sherwood POS terminal.

b.      On or about April 13, 2015, Store Clerk #1 exchanged $40 in cash for $81.25 in EBT food stamp benefits on EBT card number ending in 4643 at Martin Mart.

c.      On or about July 10, 2015, Store Clerk #1 exchanged $100 in cash for EBT food stamp benefits on EBT card number ending in 4643 at Martin Mart by calling New Sherwood Market, relaying the EBT card number and PIN to the person to the telephone, and causing a manual transaction in the amount of $196.66 for that EBT card on the New Sherwood POS terminal.

d.      On or about July 10, 2015, **SARMAD** exchanged $47 in cash for $94.91 in EBT food stamp benefits on EBT card number ending in 4687 at Rosedale Mart.

e.      On or about October 19, 2015, **SARMAD** exchanged $60 in cash for EBT food stamp benefits on EBT card number ending in 4687 at Rosedale Mart by calling New

Sherwood Market, relaying the EBT card number and PIN to the person to the telephone, and causing a manual transaction in the amount of $120.45 for that EBT card on the New Sherwood POS terminal.

      f.     On or about February 8, 2016, Store Clerk #2 exchanged $100 in cash for EBT food stamp benefits on EBT card number ending in 4687 at M&A Mart by calling New Sherwood Market, relaying the EBT card number and PIN to the person to the telephone, and causing a manual transaction in the amount of $204.43 for that EBT card on the New Sherwood POS terminal.

      g.     On or about February 22, 2016, Store Clerk #2 exchanged $50 in cash for EBT food stamp benefits on EBT card number ending in 6101 at M&A Mart, while in the presence of **SARMAD**, by calling New Sherwood Market relaying the EBT card number and PIN to the person to the telephone, and causing a manual transaction in the amount of $101.69 for that EBT card on the New Sherwood POS terminal.

      h.     On or about February 22, 2016, Store Clerk #1 exchanged $50 in cash for $101.79 in EBT food stamp benefits on EBT card number ending in 6047 at Martin Mart.

      i.     On or about August 3, 2016, Store Clerk #2 exchanged $50 in cash for $101.79 in EBT food stamp benefits on EBT card number ending in 4687 at Martin Mart.

      j.     On or about August 3, 2016, **SARMAD** exchanged $50 in cash for EBT food stamp benefits on EBT card number ending in 6101 at M&A Mart by calling New Sherwood Market, relaying the EBT card number and PIN to the person to the telephone, and causing a manual transaction in the amount of $102.15 for that EBT card on the New Sherwood POS terminal.

      k.     On or about August 5, 2016, **SARMAD** exchanged $50 in cash for $97.88 in EBT food stamp benefits on EBT card number ending in 6101 at M&A Mart by calling Martin

Mart, relaying the EBT card number and PIN to the person to the telephone, and causing a manual transaction in the amount of $97.58 for that EBT card on the Martin Mart POS terminal.

    l.  On or about August 5, 2016, Store Clerk #1 attempted to exchange $100 in cash for $201.79 in EBT food stamp benefits on EBT card number ending in 6101 at Martin Mart, while in the presence of **IRFAN**, by calling New Sherwood and relaying the EBT card number and PIN to the person on the telephone.

18 U.S.C. § 371

## COUNTS TWO THROUGH FOUR
### (Food Stamp Fraud)

1.     Paragraphs 1 through 40 and 42 through 56 of Count One of this Indictment are re-alleged and incorporated herein by reference.

2.     On or about the dates below, in the District of Maryland and elsewhere, the defendant,

### MUHAMMAD SARMAD

did knowingly use, transfer, acquire and possess food stamp coupons, through an EBT Card, having a value in excess of $100 in a manner contrary to the Food Stamp Act (Title 7, United States Code Section 2011, et seq.) and the regulations issued pursuant to that program, that is, the defendant **MUHAMMAD SARMAD** redeemed beneficiaries' electronic benefits for cash, as follows.

| COUNT | DATE | EBT TRANSACTION AMOUNT | STORE | DEFENDANT |
|---|---|---|---|---|
| **2** | April 13, 2015 | $120.25 | Rosedale Mart via manual transaction at New Sherwood | **SARMAD** |
| **3** | October 19, 2015 | $120.45 | Rosedale Mart via manual transaction at New Sherwood | **SARMAD** |
| **4** | August 3, 2016 | $102.15 | M&A Mart via manual transaction at New Sherwood | **SARMAD** |

7 U.S.C. § 2024(b)(1)
18 U.S.C. § 2

14

## COUNTS FIVE THROUGH NINE
### (Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

1.     The allegations set forth in paragraphs 1 through 40 and paragraphs 42 through 56 of Count One of this Indictment are re-alleged and incorporated herein by reference.

2.     On or about the dates below, in the District of Maryland and elsewhere, the defendant

### MUHAMMAD SARMAD

for the purpose of executing and attempting to execute the scheme to defraud, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate or foreign commerce, any writings, signs, pictures or sounds for the purpose of executing such scheme and artifice, that is, the defendants knowingly used and caused to be used a point of sale device to redeem beneficiaries' electronic benefits for unauthorized and unlawful purposes, which caused communications to be sent from a point of sale device in Maryland to Texas, as follows:

| COUNT | DATE | EBT TRANSACTION AMOUNT | CASH RECEIVED | STORE |
|---|---|---|---|---|
| 5 | April 13, 2015 | $120.25 | $60.00 | New Sherwood |
| 6 | July 10, 2015 | $94.91 | $47.00 | Rosedale Mart |
| 7 | October 19, 2015 | $120.45 | $60.00 | New Sherwood |
| 8 | August 3, 2016 | $102.15 | $50.00 | New Sherwood |
| 9 | August 5, 2016 | $97.88 | $50.00 | Martin Mart |

18 U.S.C. § 1343
18 U.S.C. § 2

## FORFEITURE

The Grand Jury for the District of Maryland further finds that:

1.     Upon conviction of the offenses in violation of Title 18, United States Code,

Sections 371 and 1343, as set forth in Counts One, and Five through Nine of this Indictment, the

defendants,

### MOHAMMAD IRFAN, and
### MUHAMMAD SARMAD,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c), any

property, real and personal, which constitutes and is derived from proceeds traceable to such

violations, including but not limited to a sum of money equal to the value of the proceeds of the

conspiracy and scheme to defraud as described in Paragraphs 39 and 40 of Count One, which

amount is at least $3,550,662.

### Substitute Assets

2.     If, as a result of any act or omission of the defendants, any such property subject

to forfeiture:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third person;

      c.     has been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided
           without difficulty;

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), to seek forfeiture

of any other property of said defendants up to the value of the forfeitable property.

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853
28 U.S.C. § 2461(c)

ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

A TRUE BILL:

_24 August 2016_
Date

**SIGNATURE REDACTED**

17